UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

IN THE MATTER OF:

CLEMENTS MANUFACTURING LIQUIDATION
COMPANY, LLC
FKA KENSA, LLC FKA CLEMENTS
MANUFACTURING OF MICHIGAN, LLC
DBA CLEMENTS MANUFACTURING, LLC

        Debtor.

_____/

CHARLES L. WELLS, III,
CHAPTER 7 TRUSTEE,

        Plaintiff,

v.

THB AMERICA, LLC,
TIANHAI ELECTRIC NORTH AMERICA, and
SAKOMA, LLC,

        Defendants.

_____/

HAROLD ZAIMA, an individual, ZAIMA
FAMILY LLC, a Michigan limited liability
company, SAKOMA, LLC, a Michigan
limited liability company, and KENSA
de HONDURAS S. de R.L., a Honduran
company,

        Plaintiffs/Counter-Defendants,
v.

CHINA AUTO ELECTRONICS GROUP LTD.,
a Bermudan corporation; HENAN TIANHAI
ELECTRIC CO., LTD., a Chinese corporation;
HEBI TIANHAI HUANQJU ELECTRIC COMPANY,
LTD., a Chinese corporation,

        Defendants,
and

TIANHAI ELECTRIC NORTH AMERICA, INC.,
A Michigan corporation; THB AMERICA, LLC,

Case No. 09-65895-TJT
Judge Thomas J. Tucker
Chapter 7

Adv. No. 10–6123

consolidated with

Adv. No. 10–7341

A Michigan limited liability company,
      Defendants/ Counter-Plaintiffs and
      Third Party Plaintiffs,

v.

CLEMENTS MANUFACTURING
LIQUIDATION CO., LLC, f/k/a
KENSA, LLC, a Michigan limited
Liability company, and CHARLES L.
WELLS, III, CHAPTER 7 TRUSTEE,

      Third Party Defendants.

_____/

## OPINION REGARDING SUMMARY JUDGMENT MOTIONS

### I. Introduction

These consolidated adversary proceedings are before the Court on three motions for summary judgment, namely,

(1) the Chapter 7 Trustee's motion for summary judgment entitled "Trustee's Motion for Summary Judgment as to Counts II and III of the Trustee's Complaint in Adversary No. 10-06123 and Counts II, III, and IX in Trustee's Cross Claim in Adversary No. 10-07341" (Docket # 104 in Adv. No. 10-6123);

(2) the Chapter 7 Trustee's motion for summary judgment entitled "Trustee's Motion for Summary Judgment as to Count I in Adversary No. 10-06123 Against Defendants THB America, LLC and Tianhai Electric North America, Inc." (Docket # 107 in Adv. No. 10-6123); and

(3) the motion for summary judgment filed by THB America, LLC ("THB") and Tianhai Electric North America, Inc. ("TENA"), entitled "THB America, LLC and Tianhai Electric North America, Inc.'s Motion for Summary Judgment as to Claims Asserted by Trustee" (Docket # 110 in Adv. No. 10-6123).

The Court held lengthy hearings on these motions, then took them under advisement.  For the reasons stated in this opinion, the Court will deny each of the motions.

## II.  Background

The following background facts are rather complicated, but they are undisputed.

### A.  The Kensa Business Entity

Prior to January 1, 2008, the Chapter 7 Debtor in this case, Clements Manufacturing Liquidation Company, LLC, was known as Kensa LLC ("Old Kensa" or "Kensa").  It was one of five related companies operating out of Michigan, Mexico, and Honduras, which designed, manufactured, distributed, and sold wiring harnesses and battery cable assemblies for automotive companies and their tier one suppliers.  All of the entities were controlled, either directly or indirectly, by Harold Zaima ("Zaima"), a Japanese-American citizen of the United States, who was the President of Old Kensa.  Those five Zaima-controlled entities were Old Kensa; Deckerville Wire, Inc. ("Deckerville"); Sakoma, LLC ("Sakoma"); Kensa de Honduras S. de R.L. ("Kensa Honduras"); and Kensa de Mexico de S. de C.V. ("Kensa Mexico")(collectively, the "Kensa Business Entity" or the "Kensa Enterprise").[1]

---

[1] Before January 1, 2008, Old Kensa was a wholly-owned subsidiary of Zaima Family, LLC. Zaima held a 40% membership interest in, and 100% of the voting rights of, Zaima Family, LLC. Zaima's three minor children, through Trusts, each held a 20% membership interest in Zaima Family, LLC.

Zaima Family, LLC also held 100% of the membership interests in Arizaima LLC ("Arizaima"). Arizaima is a holding company that never had any operations.  Lulani, Inc., a Chapter S corporation ("Lulani"), was the manager of Zaima Family LLC.  Kensa Honduras was owned 50% by Arizaima and 50% by Zaima Family, LLC.  Kensa Mexico was owned .003% by Arizaima and 99.007 % by Old Kensa.  Old Kensa owned 100% of the membership interests in Deckerville.  Zaima owned 100% of the membership interests in Sakoma.

3

Old Kensa designed, distributed, and sold the wiring harnesses and cable assemblies. Sakoma was a distributer of the electrical components of the wiring harnesses. Kensa Mexico and Kensa Honduras manufactured the wiring harnesses and battery cable assemblies. Deckerville was the employer of all the employees located in Deckerville, Michigan, and Sterling Heights, Michigan, who worked for Old Kensa. Because Zaima was Japanese-American, Kensa was a minority-owned business.

Old Kensa had term loans and a line of credit from Comerica Bank ("Comerica"), which were secured by liens on all of the assets of the Kensa Business Entity. Zaima had personally guaranteed these loans. During 2007, Old Kensa had defaulted numerous times under the terms of its loan documents with Comerica, had entered into forebearance agreements with Comerica, had defaulted under the terms of various forebearance agreements, and was having difficulty securing further loans needed for operating expenses.[2] As a result, during 2007, the Kensa Business Entity was in financial distress and in need of a capital infusion.

**B. China Auto Electronics Group, Ltd.'s negotiations with Zaima**

In May or June of 2007, China Auto Electronics Group, Ltd. ("CAE "), a foreign corporation which desired to expand its business into the United States automotive market, and its wholly owned United States subsidiary, CAE US Holdings, Inc. ("CAE US"), asked Zaima about the possibility of CAE, either directly or indirectly, purchasing some or all of the assets of, and membership interests in, the Kensa Business Entity. As a result of this inquiry, CAE and Zaima entered into negotiations, which led to the execution of a transaction term sheet in January

---

[2] *See* Ex. 5 of Docket # 110 in Adv. No. 10-6123 (Letter to Zaima dated February 12, 2008 from Comerica).

2008, followed by a closing of a complex set of related transactions in late February 2008. Some more specific details are set forth later in this opinion, but the following description of the related transactions, quoted from a brief filed by THB and TENA, is a good summary:

> By January 2008, the parties had agreed in principle on a complicated transaction consisting of a number of steps and simultaneous, multilateral agreements, which can be summarized as follows:
>
> 1.    Step 1 – Form THB and THB de Honduras as new companies.
>
> 2.    Step 2 – THB to purchase some of the assets of Kensa and Deckerville Wire; THB de Honduras to purchase some of the assets of Kensa de Mexico and Kensa de Honduras. All outstanding debt to Comerica Bank, including term loans and line of credit, to be retired as part of closing.
>
> 3.    Step 3 – CAE US to acquire an 80% membership interest in THB and 80% ownership interest in THB de Honduras; Zaima to purchase the 20% membership interest in THB and 20% ownership interest in THB de Honduras.
>
> During the negotiation process, however, it occurred to the parties that because THB was to be majority owned by CAE US, it would not be considered a minority owned business as Kensa had been and that this might hurt THB's ability to win business from some potential customers. In order to address this problem, the parties added some additional steps and agreements to the contemplated transaction, which can be summarize[d] as follows.
>
> 4.    Step 4 – Have one of Zaima's existing but non-operating entities, Sakoma LLC ("Sakoma"), purchase Kensa's accounts receivable and assume liabilities related to certain existing purchase orders.
>
> 5.    Step 5 – CAE to become 45% owner of Sakoma; Zaima to retain 55% stake in Sakoma.
>
> 6.    Step 6 – Execute Supply Agreement between Sakoma and THB under which Sakoma could sell THB products, and only THB products, to purchasers wishing to do business with a minority owned company for a 2% commission.

5

The sum and substance of the transaction, however, remained the same; namely, at the end of the day CAE US would have the foothold in the U.S. automotive industry it desired in the form of 80% ownership of this newly formed "THB Enterprise," and the THB Enterprise would be free and clear of all outstanding debt to Comerica.

The parties closed their transaction on or about February 29, 2008 by simultaneously entering into the various Asset Purchase Agreements, Unit (Equity) Purchase Agreements and Supply Agreement, all necessary to consummate the steps outlined above. However, in an attempt to make a clean cutoff on the books and records of both the buyers and the sellers, the "effective date" of all of the APAs and UPAs was agreed to be January 1, 2008.

In return for its 80% stake in the THB Enterprise, CAE US provided the Kensa Enterprise cash in the amount of $9,797,881– largely used to retire the Kensa Enterprise's debts to Comerica which by the time of the closing, including the increased line of credit, totaled $9,268,330. . . .

In addition to cash, CAE US provided the following consideration: (1) a $1,840,000 promissory note to either THB de Honduras or Kensa de Honduras to be paid upon certain conditions; (2) a holdback/earnout of $2,909,351 to be paid upon certain conditions; and [(3)] the assumption of certain specified Kensa Enterprise liabilities explicitly set forth in the Asset Purchase Agreements.[3]

### 1. The Transaction Term Sheet

In January 2008, CAE, Old Kensa, Kensa Honduras, Sakoma, and Zaima entered into an agreement, entitled "China Auto Electronics Group Limited - KenSa Transaction Term Sheet" (the "Transaction Term Sheet"), which expressed their "commitments . . . with respect to a transaction in which certain assets of [Old Kensa, Kensa Honduras, and Sakoma, would] be sold to certain new entities, which entities [would] be owned, directly or indirectly, by CAE, or its

---

[3] THB and TENA Br. (Docket # 110 in Adv. No. 10-6123), at 4-6 (footnote and record citations omitted).

6

affiliates, and Zaima, or his successors and assignees."[4]  Under the Transaction Term Sheet, new

entities were to be formed — THB America, LLC ("THB America") and THB Honduras.[5]  The

Transaction Term Sheet provided, in relevant part:

**2. Preparation of Definitive Agreements** -   The terms of the transactions
contemplated herein will be more particularly set forth in definitive
agreements (collectively "Definitive Agreements") that will govern the
transactions.  The Definitive Agreements shall be effective as of January 1,
2008.  The parties will continue to negotiate the terms and begin preparation
of the Definitive Agreements.  The Definitive Agreements are expected to
include, without limitation:

(1) *Asset Purchase Agreement between [Old Kensa] and
[Sakoma]*: Agreement for the purchase of any assets from [Old
Kensa] necessary to operate [Sakoma];

(2) *Asset Purchase Agreement between [Old Kensa] and THB
America*: Agreement for the purchase of any assets from [Old
Kensa] necessary to operate THB America and certain known
liabilities;

(3) *Asset Purchase Agreement between [Kensa Honduras] and
THB Honduras*: Agreement for the purchase of any assets from
[Kensa Honduras] necessary to operate the Honduras plant;

(4) *Unit Purchase Agreement between Zaima (the sole shareholder
of [Sakoma] and [CAE US]:* CAE US will purchase 49% of the
membership interests of [Sakoma];

(5) *Unit Purchase Agreement between Zaima (sole shareholder of
[THB America] and [CAE US]:* CAE US will purchase 80% of the
membership interests of THB America and the small percentage of
THB Honduras;

(6) *Operating Agreement of THB America:* Agreement will provide
for customary terms, including tag-along and drag-along rights and

---

[4] Ex. 9 of Docket # 110 in Adv. No. 10-6123.

[5] *Id.* at 1 ¶ 1.(a), 2 ¶ 1.(c).

7

member and member buyout at a price set by fair valuation (method to be determined).

(7) *Operating Agreement of [Sakoma]*: Agreement will provide for customary terms, including tag-along and drag-along rights;

(8) *Supply Agreement between THB America and Sakoma:* Two year term with automatic renewals for the supply of parts from THB America to [Sakoma]. The agreement will have a 2 yrs non-compete after its expiration;

(9) *Master Purchase Order:* Agreement for the supply by CAE, or its affiliate, of certain tooling, engineering, and related support to THB America.

(10) *Employment Agreement:* Zaima will be employed by THB America on terms to be agreed by the parties.[6]

## 2. The agreements comprising the sale, to CAE US, of the assets and membership interests of the Kensa Business Entity

As contemplated by the Transaction Term Sheet, on February 5, 2008, Zaima Family LLC formed THB America and THB Honduras. Then, on February 29, 2008, as contemplated by the Transaction Term Sheet, a complex transaction was done, to accomplish the transfer to CAE US of the ownership and control of most of the assets that had formerly been owned and controlled by the Kensa Business Entity, by the execution of multiple complex agreements. All of these February 29, 2008 agreements provided that they would be effective as of January 1, 2008. The relevant agreements were as follows:

- An "Asset Purchase Agreement" between Old Kensa and Deckerville, as "Seller," and Sakoma as the "Purchaser" (the "**Sakoma APA**"). Under the Sakoma APA, Sakoma purchased some of the assets of Old Kensa and Deckerville, including Old Kensa's name, assumed certain liabilities of Old Kensa related to certain purchase orders, and

---

[6] *Id.* at 3-4 ¶ 2.

8

paid $100,000.[7] The Sakoma APA stated that "[t]he representations and warranties of Sellers contained in Article 3 of ["the Asset Purchase Agreement by and among Seller, Deckerville Wire, Inc. and THB America, LLC dated the date hereof] are incorporated herein by reference."[8]

- An "Asset Purchase Agreement" between Old Kensa and Deckerville as "Seller," and THB America as the "Purchaser" (the **THB America APA**). Under this agreement, THB America purchased some of the assets of Old Kensa, assumed some of the liabilities that Old Kensa incurred after January 1, 2008, and paid $100,000.[9] THB America purchased the books and records of Old Kensa, effective January 1, 2008, and did not keep separate books.

- An "Asset Purchase Agreement" between Old Kensa, Kensa Mexico and Kensa Honduras as "Seller," and THB Honduras as the "Purchaser" (the **"THB Honduras APA"**). Under this agreement, the Seller transferred certain (1) personal property; (2) leases; and (3) agreements from the Kensa Mexico and Kensa Honduras operations to the Purchaser, for $11,437,881, and assumed certain liabilities. Old Kensa was to receive $5,855,000 of the proceeds of this asset sale, Kensa Mexico was to receive $235,000, and Kensa Honduras was to receive $5,347,881.[10]

- A "Unit Purchase Agreement" in which THB America, and Sakoma, as "Sellers," sold to CAE US, as "Purchaser," "45% of [Sakoma's] outstanding voting membership interests" for $100,000, and "80% of the outstanding voting membership interests of THB America," for $100,000.[11] Zaima Family, LLC was also a party to this Unit Purchase Agreement and owned 100% of both Sakoma and THB America at the time of this agreement.[12] This Unit Purchase Agreement stated that "[t]he Sellers have no assets or Liabilities other than those transferred to each company by the Asset Purchase Agreements."[13] This Unit Purchase Agreement defined "'Asset Purchase

---

[7] Ex. 10b of Docket # 110 in Adv. No. 10-6123 at ¶¶ 2.01, 2.02, 2.04.

[8] *Id.* at ¶¶ 1.01 (defining "THBA APA"), 3.01.

[9] Ex. 10 of Docket # 110 in Adv. No. 10-6123 at ¶¶ 2.01, 2.02, 2.04.

[10] Ex. 10a of Docket # 110 in Adv. No. 10-6123 at ¶¶ 2.01, 2.02, 2.04.

[11] Ex. 10c of Docket # 110 in Adv. No. 10-6123 at ¶¶ 2.01(i) and (ii), 2.02, 2.03.

[12] *Id.* at ¶ 3.02.

[13] *Id.* at ¶ 3.03.

Agreements' [to mean] each of the [Sakoma] APA and THB [America] APA and any other agreements contemplated in such agreements."[14]

- A "Unit Purchase Agreement" in which THB Honduras, as the "Seller," sold to CAE US as "Purchaser" "80% of Seller's outstanding voting membership interests" for $14,347,351.[15] Zaima Family, LLC was also a party to this Unit Purchase Agreement and owned 100% of THB Honduras at the time of this agreement.[16] This Unit Purchase Agreement stated that "Seller has no assets or Liabilities other than those transferred to THB Honduras pursuant to the [THB Honduras] APA."[17]

- The "Supply Agreement" between THB America, as the "Supplier," and Sakoma as the "Company," to facilitate distribution of products to companies who wanted to do business with a minority-owned company.[18]

After all of the agreements were executed on February 29, 2008, the situation was this:

(1) most or all of the assets of the Kensa Business Entity had been transferred to THB America, THB Honduras, and Sakoma; (2) CAE US owned 80% of the membership interests in the two newly formed entities, THB America and THB Honduras; (3) Zaima Family, LLC owned 20% of the membership interests in each of these two new entities; (4) CAE US owned 45% of the equity interests in Sakoma; and (5) Zaima Family, LLC owned 55% of the membership interests in Sakoma.

---

[14] *Id.* at ¶ 1.01 (defining "Asset Purchase Agreements").

[15] Ex. 10d of Docket # 110 in Adv. No. 10-6123 at ¶¶ 2.01(I), 2.02.

[16] *Id.* at 3.02.

[17] *Id.* at ¶ 3.03.

[18] Ex. 10e of Docket # 110 in Adv. No. 10-6123. Sakoma was still considered a minority owned business because Zaima retained a 55% membership interest in Sakoma, when CAE US acquired 45% of the membership interests.

## III. Summary judgment standards

As this Court has stated previously, in *McCallum v. Pixley* (*In re Pixley*), 456 B.R. 770,

774-75 (Bankr. E.D. Mich. 2011):

> Fed.R.Civ.P. 56(a), applicable to bankruptcy adversary proceedings under Fed.R.Bankr.P. 7056, provides that a motion for summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149-50 (6th Cir. 1995), the court elaborated:
>
>> The moving party has the initial burden of proving that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. To meet this burden, the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the failure of the nonmoving party to produce any evidence which would create a genuine dispute for the [trier of fact]. Essentially, a motion for summary judgment is a means by which to challenge the opposing party to 'put up or shut up' on a critical issue.
>> If the moving party satisfies its burden, then the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by [the trier of fact]. In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party. However, if the evidence is insufficient to reasonably support a . . . verdict in favor of the nonmoving party, the motion for summary judgment will be granted. Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff.
>> . . .
>> Finally, the Sixth Circuit has concluded that, in the "new era" of summary judgments that has evolved from the teachings of the Supreme Court in

11

> *Anderson* [*v. Liberty Lobby, Inc.,* 477 U.S. 242
> (1986)], *Celotex* [*Corp. v. Catrett,* 477 U.S. 317
> (1986)] and *Matsushita* [*Electric Indus. Co., Ltd. v.
> Zenith Radio Corp.,* 475 U.S. 574 (1986)], trial
> courts have been afforded considerably more
> discretion in evaluating the weight of the
> nonmoving party's evidence. The nonmoving party
> must do more than simply show that there is some
> metaphysical doubt as to the material facts. If the
> record taken in its entirety could not convince a
> rational trier of fact to return a verdict in favor of
> the nonmoving party, the motion should be granted.

> *Id.* (internal quotation marks and citations omitted). In
> determining whether the moving party has met its burden, a court
> must "believe the evidence of the nonmovant, and draw all
> justifiable inferences in favor of the nonmovant." *Ingram v. City
> of Columbus*, 185 F.3d 579, 586 (6th Cir.1999)(relying on *Russo v.
> City of Cincinnati*, 953 F.2d 1036, 1041-42 (6th Cir.1992)).

## IV. The Trustee's first summary judgment motion (Docket # 104)

In the first of his summary judgment motions, filed at Docket # 104, the Chapter 7

Trustee seeks summary judgment against Defendant Sakoma, LLC ("Sakoma"), on Counts II and

III of the Trustee's complaint (Docket # 1) in Adversary No. 10-6123, and on Counts II, III and

IX of the Trustee's cross-claims (Docket # 5) in Adversary No. 10-7341. The Trustee seeks

summary judgment avoiding, under 11 U.S.C. § 548(a) as a fraudulent transfer, the transfer of

assets made by the Debtor, then known as Kensa, LLC, to Sakoma under the Sakoma APA —

*i.e.*, one of the "Asset Purchase Agreements" dated February 29, 2008.[19] And the Trustee seeks

summary judgment for the recovery from Sakoma, under 11 U.S.C. § 550(a)(1), of the difference

between the value of the assets transferred by the Debtor to Sakoma and the value of the benefits

---

[19] A copy of the Sakoma APA is Ex. 10b at Docket # 110.

received by the Debtor in exchange, which the Trustee says is "at least $1,726,215.60."[20]  The Court must deny this summary judgment motion, however, for the following reasons.

### A. The Trustee's reliance on the Sanilac County Circuit Court's March 26, 2010 opinion

As part of his argument, the Trustee relies on certain findings in a March 26, 2010 opinion, and related judgment, of the Sanilac County, Michigan Circuit Court in the case of *Deckerville Industrial Investors, LLC v. Kensa, LLC and Sakoma, LLC*, Case No. 09-322733-CK (the "Sanilac County Opinion").  The Trustee argues that the Sanilac County Opinion has a preclusive effect in these consolidated adversary proceedings, under the doctrine of collateral estoppel.  Specifically, the Trustee relies on the state court's findings, made after a bench trial, that "the Sakoma APA was complete on its face," and that "the Sakoma APA was 'fraudulent and a scheme to avoid liability.'"[21]

But the Court concludes that the Sanilac County Opinion has no preclusive effect in these adversary proceedings.  The first reason why this is so is that the Chapter 7 Trustee was not a party in the Sanilac County case, and the Chapter 7 Trustee cannot properly be viewed as being in privity with any of the parties in that case, or a successor-in-interest, for collateral estoppel purposes, to any of the parties in that case.  Because of this, the necessary element of "mutuality of estoppel" is missing, as required by Michigan collateral estoppel law, so that this Court may not give any preclusive effect to the Sanilac County Opinion.  *See Citizens Ins. Co. of America v. King* (*In re King*), 500 B.R. 511, 514-17 (Bankr. E.D. Mich. 2013).  Because Michigan courts

---

[20]  Trustee's Reply Br. (Docket # 143) at 4.

[21]  Mot. (Docket # 104) at 9.

13

would not give preclusive effect to the Sanilac County Opinion in favor of the Chapter 7 Trustee in this situation, this Court likewise may not do so. *See generally McCallum v. Pixley* (*In re Pixley*), 456 B.R. 770, 775-76 (Bankr. E.D. Mich. 2011).

The Trustee has cited no authority in support of his argument that the Trustee can be viewed as in privity with, or a successor of, the single creditor who was the Plaintiff in the Sanilac County case (Deckerville Industrial Investors, LLC ("Deckerville Investors")), and the Court rejects such an argument. The Court is aware of no authority that supports the argument. While the Chapter 7 Trustee has a fiduciary duty in the Chapter 7 case to all the creditors of the Debtor, including Deckerville Investors, nothing in the Bankruptcy Code suggests that the Trustee is legally deemed to be a successor-in-interest to or in privity with any single creditor, for collateral estoppel purposes.

Another flaw in the Trustee's successor/privity argument arises from the fact that the Sanilac County Opinion, filed March 26, 2010, and the March 9, 2010 non-jury trial on which that opinion was based, both occurred many months after the filing of Debtor's Chapter 7 bankruptcy case and the appointment of the Chapter 7 Trustee, which occurred on August 20, 2009. Thus, although the Chapter 7 Trustee had been appointed Trustee and had been acting as such for some seven months, the Trustee was not a party in the Sanilac County case when it was tried and decided in March 2010. Under these circumstances, and given this timing, the Trustee cannot be viewed as a *successor* to the single creditor who prosecuted the Sanilac County case, Deckerville Investors, with respect to the Sanilac County Opinion.

Moreover, the actions of the Sanilac County Circuit Court in conducting the trial on March 9, 2010, and in issuing its opinion on March 26, 2010, both were violations of the

automatic stay under 11 U.S.C. § 362(a), and the Sanilac County Opinion appears to be voidable as a result. *See generally Easley v. Pettibone Mich. Corp.*, 990 F.2d 905, 911 (6th Cir. 1993) ("In summary, we hold that actions taken in violation of the stay are invalid and voidable and shall be voided absent limited equitable circumstances.").

In the hearing on the summary judgment motions, the Trustee's counsel described the Sanilac County case as being an action by Deckerville Investors, as a judgment creditor of the Debtor, to collect on a garnishment. Deckerville Investors had obtained a judgment against the Debtor and garnished an account receivable owing from Chrysler. According to the Trustee's counsel, in the Sanilac County case, Sakoma argued that the receivable owing from Chrysler belonged to Sakoma, rather than the Debtor. From the Trustee's description, it is clear that the Sanilac County action was the continuation of an action by Deckerville Investors against the Debtor to recover a pre-petition claim against the Debtor, within the meaning of 11 U.S.C. § 362(a)(1), and therefore was prohibited by the automatic stay.

Nor has Deckerville Investors or the Trustee, or anyone else, argued that the trial and opinion that occurred in the Sanilac County case should not be deemed void, based on the recognized equitable exceptions to the rule in *Easley v. Pettibone*. No one has argued that Deckerville Investors did not receive proper and timely notice of the filing of the Debtor's Chapter 7 bankruptcy case. Rather, the record is clear, and it is undisputed, that Deckerville Investors *did* receive such notice, long before March 2010. For example, on August 23, 2009, the Bankruptcy Noticing Center mailed to Deckerville Investors, along with numerous other

15

creptors of the Debtor, a copy of the notice of the commencement of the bankruptcy case. (*See* Docket # 5 in Case No. 09-65895).[22]

For these reasons, to the extent the Trustee's motion is based on the alleged preclusive effect of any of the findings or conclusions in the Sanilac County Opinion, the motion must be denied. Nor do the findings and conclusions of the state court judge in the Sanilac County Opinion otherwise have any probative value in the consolidated adversary proceedings. Absent any preclusive effect under the doctrine of collateral estoppel, such state court findings and conclusions are simply the opinions of a state court judge in another case, and have no relevance here.

### B. The Trustee's other summary judgment arguments

The Trustee seeks summary judgment against Sakoma even without the benefit of the Sanilac County Opinion. But the motion must be denied. The Trustee's motion against Sakoma depends upon the Court comparing what the Debtor gave versus what the Debtor received under the Sakoma APA, in isolation. That is, the Trustee's argument is that the value of the accounts receivable and other assets transferred by the Debtor to Sakoma, under the Sakoma APA, exceeds the value of what the Debtor received in exchange, under the Sakoma APA. The Trustee argues this in support of his "constructive" fraudulent transfer theory under 11 U.S.C. § 548(a)(1)(B), as well as his "actual intent" fraudulent transfer theory under § 548(a)(1)(A)(that the Debtor made the transfers "with actual intent to hinder, delay or defraud" a creditor).

---

[22] Deckerville Investors was scheduled as a creditor, based on a 2008 default judgment in the amount of $130,628.50, in the Debtor's Schedule F, filed August 20, 2009 (Docket # 1 in Case No. 09-65895), and in Debtor's amended Schedule F, filed October 19, 2009 (Docket # 15 in Case No. 09-65895).

16

But the Court cannot view the transfers to and from the Debtor under the Sakoma APA in isolation. It is clear beyond any genuine dispute that the Sakoma APA and the transfers made under that agreement were only part of a larger, integrated transaction involving several asset purchase agreements and other agreements, numerous related entities, and numerous transfers of value back and forth. The larger transaction was the means by which the ownership and control of the assets and business of the Kensa-related entities, which were owned and controlled (directly or indirectly) by Harold Zaima, were sold and transferred to, directly or indirectly, CAE. The larger transaction was shaped and structured beginning with the "Transaction Term Sheet" executed by the parties in January 2008,[23] and culminating in the execution of the numerous agreements all at the same time, on February 29, 2008. The larger transaction includes three different asset purchase agreements, including the Sakoma APA, plus a supply agreement and three unit purchase agreements.[24] The agreements were all executed and closed contemporaneously, and the undisputed evidence in the record, in the form of the uncontradicted testimony of Harold Zaima, is that none of the agreements would have been executed unless all of them were.[25]

Under the circumstances, in order to determine whether the Debtor received reasonably equivalent value for the assets that it transferred in this larger transaction, the Court must consider the value of everything that the Debtor transferred, and the value of every benefit, direct

---

[23] Ex. 9 at Docket # 110.

[24] Copies of the agreements are in the record as exhibits to the motion for summary judgment filed by THB and TENA (Docket # 110, Exs. 10 and 10a through 10e).

[25] *See* Tr. of March 11, 2010 Rule 2004 examination of Harold Zaima (Docket # 110, Ex. 11) at 120-23, 74-75, 80, 84, 95, 135.

and indirect, that the Debtor received in exchange, not just directly from Sakoma, but from any source, as part of the larger transaction. *See generally Franklin Advisors, LLC v. Sherwood Mgmt. Corp.* (*In re Whyco Finishing Tech., LLC*), 500 B.R. 517, 531-33 (Bankr. E.D. Mich. 2013)(discussing the concepts of direct and indirect benefits). Viewed in this light, the Debtor received, in exchange for assets it transferred, not only the consideration transferred to the Debtor under the Sakoma APA, — namely $100,000.00 and the assumption of certain specified liabilities by Sakoma[26] — but also other benefits of value. Such benefits included the payment in full of the Debtor's debt to Comerica, which totaled roughly $9.2 million at the time of the closing of the Kensa Business Entity transaction.

When the Debtor's transfers made to Sakoma under the Sakoma APA are viewed in light of the larger Kensa Business Entity transaction, as they must be, it is clear that the Trustee has not demonstrated an entitlement to summary judgment on either of his fraudulent transfer theories against Sakoma (constructive fraudulent transfer; actual intent fraudulent transfer). Indeed, the Trustee has not even tried to demonstrate an entitlement to summary judgment under this larger view of the transaction.

The Court agrees with the many cases holding that in a situation like this, the Court must view the fraudulent transfer claim in light of the entire larger transaction. *See, e.g., Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark* (*In re Nat'l Forge Co.*), 344 B.R. 340, 347-48 (W.D. Pa. 2006); *Official Comm. of Unsecured Creditors of Grand Eagle Cos., Inc. v. Asea Brown Boveri, Inc.*, 313 B.R. 219, 229 (N.D. Ohio 2004); *Mills v. Everest Reinsurance Co.*, 410 F. Supp. 2d 243, 254-55 (S.D.N.Y. 2006); *Creditors' Comm. of Jumer's Castle Lodge,*

---

[26] *See* Sakoma APA at 3, ¶¶ 2.02, 2.04(a).

*Inc. v. Jumer* (*In re Jumer's Castle Lodge, Inc.*), 338 B.R. 344, 356 (C.D. Ill. 2006), *aff'd*, 472 F.3d 943 (7th Cir. 2007); *Brown v. Gen. Elec. Capital Corp.* (*In re Foxmeyer Corp.*), 286 B.R. 546, 573-74 (Bankr. D. Del. 2002).

In support of his narrower view of the transaction, the Trustee points to the integration clause in the Sakoma APA, which states:

> 7.10  Entire Agreement.  This Agreement sets forth the entire understanding and agreement between the parties as to the transactions contemplated hereby and supersedes and replaces any prior understanding, agreement or statement of intent, in each case, written or oral, of any and every nature with respect to such understanding, agreement or statement.[27]

This provision does not require the Court to put on blinders and ignore the fact that the Sakoma APA was an integral part of the larger transaction.  Nor can the Court ignore the fact that the parties to the Sakoma APA, together with the other parties to the other related agreements in the larger transaction, contemplated that all of the agreements, and all of the transactions contemplated by the agreements, were related parts of the larger transaction.

The reference in the Sakoma APA's integration clause to the Sakoma APA document being "the entire understanding and the agreement between the parties as to the transactions contemplated hereby" clearly means that the Sakoma APA stated all of the terms *of that piece of the larger transaction*, and nothing more.  Neither this provision nor any other provision in the Sakoma APA suggests otherwise.  Moreover, there are references in the Sakoma APA to the other agreements that were part of the larger transaction, and there are multiple references in the other agreements to the Sakoma APA.[28]

---

[27] Sakoma APA (Ex. 10b of Docket # 110 in Adv. No. 10-6423) at 11 ¶ 7.10.

[28] *See* THB/TENA Reply Br. (Docket # 142) at 3 (citing examples).

Based on the present record, the Court concludes that the Trustee has not presented evidence sufficient to support or permit summary judgment for the Trustee on either of his fraudulent transfer theories relating to the Sakoma APA (constructive fraudulent transfer and "actual intent" fraudulent transfer, including the Trustee's arguments that certain "badges of fraud" exist).

For all of the these reasons, the Trustee's first summary judgment motion (Docket # 104) must be denied.

## V. The Trustee's second summary judgment motion (Docket # 107) and the summary judgment motion filed by THB and TENA (Docket # 110)

In the second of his summary judgment motions, filed at Docket # 107, the Chapter 7 Trustee seeks summary judgment on Count I of his complaint in Adversary No. 10-6123, against THB and TENA. This count is sometimes referred to by the parties as the "due to/due from" claim. The Trustee seeks a judgment, jointly and severally against THB and TENA, in the amount of $625,488.00.[29] The Trustee claims that this is the net amount owing by THB and TENA to the Debtor's estate, which arose because of a net increase in the Debtor's liability on the Debtor's line of credit with Comerica. That increase arose during the period between the January 1, 2008 Effective Date of the Kensa Business Entity transactions and the date in March 2008 when the Debtor paid off the balance owing on the Comerica line of credit (the "gap period"). The Trustee calculates this net amount of increase in the Comerica line of credit as $1,468,589.82 ($1,569,593.82 increase in the line of credit minus a payment on the line of credit

---

[29] Count I of the Trustee's complaint demands judgment in the amount of $1,532,153.09. But as the Trustee explained in his summary judgment motion and during the hearing on the summary judgment motions, the Trustee is now only seeking the amount of $625,488.00 under Count I.

in the amount of $101,004.00 that THB made in early March 2008). The Trustee then reduces

this amount by the $843,102.00 amount that the Trustee says was owing from the Debtor to

THB/TENA, arising out of the same time period. The resulting net amount is $625,488.00

owing to the bankruptcy estate (rounded up from $625,487.82), according to the Trustee.

In their joint motion for summary judgment, filed at Docket # 110, THB and TENA seek

summary judgment on all claims asserted against them by the Chapter 7 Trustee in these

adversary proceedings. These include Counts I, IV, and V of the Trustee's complaint in

Adversary No. 10-6123, and Counts IV and V of the Trustee's cross-claims in Adversary No. 10-

7341. Counts IV and V in the Trustee's complaint allege that "[t]he Sakoma APA, the THB

APA and the Honduras APA transferred substantially all of the assets of the Debtor" to THB,[30] as

"initial transferee," and later to TENA, as "the immediate transferee."[31] These counts seek to

avoid the transfers as fraudulent, and recover, from THB and TENA, the unspecified amount by

which the Debtor's "going concern value" at the time of the transfers exceeded the purchase

price in the Kensa Business Entity transaction.[32]

The counts against THB and TENA in the Trustee's cross-claims filed in Adversary No.

10-7341, Counts IV and V, seek judgment on the same avoidance-and-recovery theories that the

Trustee seeks in other counts against Sakoma, as described at the beginning of Part IV of this

---

[30] *E.g.*, Trustee Compl. in Adv. No. 10-6123 (Docket # 1) at ¶ 92.

[31] *Id.* at ¶¶ 104, 105, 119, 120.

[32] *See id.* at 19, 21.

opinion.[33]  As with the counts against Sakoma, discussed above, these counts in the Trustee's cross-claims narrowly focus on the transfer of the Debtor's assets under the Sakoma APA.

The Court must deny both of these summary judgment motions, for the following reasons.

**A.  Count I of the Trustee's complaint (the "due to/due from" claim)**

The Court makes the following conclusions relevant to the cross-motions on Count I (the "due to/due from" claim) of the Trustee's complaint.

First, any increase in the Debtor's liability under the Comerica line of credit that occurred during the gap period, the proceeds of which were used for the operations of the "Transferred Assets" (as that term is defined in ¶ 2.01(a) of the THB APA) after January 1, 2008, is a liability that *was* assumed by THB under ¶ 2.02(a)(ii) of the THB APA.[34]  Any *other* increase in the Debtor's liability under the Comerica line of credit that occurred during or before the gap period is a liability of the Debtor that was *not* assumed by THB, under the THB APA or otherwise. Rather, any such *other* increase is a liability that was *excluded* from the liabilities that THB

---

[33]  *See* Trustee's Cross-Claim (Docket # 5 in Adv. No. 10-7341) at 11-14.

[34]  Paragraph 2.02(a)(ii) of the THB APA, which contains several terms that are defined elsewhere in the agreement, states:

> (a) On the terms and subject to the conditions of this Agreement, at the Closing, Purchaser agrees to assume and discharge or perform when due, and shall assume pursuant to the Assumption Agreement, the following Liabilities (the "<u>Assumed</u> <u>Liabilities</u>"):
> . . .
>
> (ii) all obligations, Claims, Damages, and Liabilities arising out of the operations of the Transferred Assets from and after the Effective Date;

(Ex. 10 of Docket # 110 in Adv. No. 10-6123 at ¶ 2.02(a)(ii)(underlining in original)).

assumed, by ¶ 2.02(b)(ii) of the THB APA.[35]  These sections make clear that THB had no

liability, to the Debtor or to anyone else, for any such *other* increase in the Comerica line of

credit.  The THB APA, and the provisions just cited, are clear and unambiguous on each of these

points.[36]

As noted above, the Trustee calculates that the net amount of increase in the Debtor's

Comerica line of credit that occurred between the January 1, 2008 Effective Date of the THB

APA and the March 2008 Comerica line of credit payoff was $1,468,589.82.  Of this, the

evidence presently in the record indicates that *some amount* may have been used to pay the

Debtor's accounts payable that arose **before** the January 1, 2008 Effective Date.  None of any

such amount can be deemed to have been used for the operation of the "Transferred Assets" **after**

January 1, 2008, but rather must be deemed to have been used for the operation of the those

---

[35]  Paragraph 2.02(b)(ii) of the THB APA states:

> (b)  Purchaser is not assuming, and shall not assume pursuant to the Assumption Agreement, any Liability of Seller other than the Assumed Liabilities, and Sellers shall retain all such other Liabilities, including the Liabilities set forth below ("Excluded Liability"):
> . . .

> (ii) All obligations, Claims, Damages and obligations arising out of the operation of the Business prior to the Effective [D]ate.

(*Id.* at ¶ 2.02(b)(ii).)

[36]  THB and TENA argue, more broadly, that the parties could not have intended for THB to assume liability for any part of the Debtor's debt on the Comerica line of credit, because the parties contemplated and intended that the line of credit would be paid off as a result of the agreements that were closed on February 29, 2008.  And, in fact, the line of credit was paid off.  But the Court rejects this argument.  THB and TENA have cited no provision in the THB APA, or in any other of the February 29, 2008 agreements, that support this argument.  And as the Court concludes above, under the unambiguous provisions of the THB APA, THB did assume liability for an increase in the Debtor's Comerica line of credit, if and to the extent proceeds of such increase were used for the operations of the "Transferred Assets" after January 1, 2008.

assets **before** January 1, 2008. Any such amount therefore is an **excluded** liability under the THA APA sections cited above. By contrast, any amount used to pay the Debtor's accounts payable that arose **after** January 1, 2008 must be deemed to have been used for the operation of the "Transferred Assets" after January 1, 2008. Any such amount, therefore, is a liability that THB assumed, and is not an excluded liability.

The evidence presently in the record does not demonstrate, beyond a genuine dispute, the amounts of these assumed and excluded liabilities. Each side has filed numerous exhibits, including an affidavit and/or reports from accounting experts. But neither side has presented evidence showing, beyond a genuine dispute, the following: how much of the Debtor's accounts payable, that were paid with proceeds from post-Effective Date increases in the Comerica line of credit, were incurred by the Debtor before the January 1, 2008 Effective Date, as opposed to incurred after January 1, 2008?

Because of this, the Court cannot yet determine how much, if any, of the post-January 1, 2008 increase in the Comerica line of credit is a liability assumed by THB under the THB APA. For this reason, the Court cannot grant summary judgment for either the Trustee or for THB/TENA on the Trustee's "due to/due from" claim.[37]

The Trustee's accounting expert, Kurt P. Mueller, stated in his affidavit that "[t]he [$1,569,593.82 in] additional funds advanced by Comerica Bank under the Line of Credit between January 1, 2008 and February 29, 2008 were used to fund the operations of THB

---

[37] TENA makes other arguments as to why it is entitled to summary judgment on this claim, which are discussed later in this opinion.

America, LLC, after January 1, 2008."[38]  And in his unsworn expert report, dated September 28,

2012, Mr. Mueller asserted that under ¶ 2.02(a) of the THB APA, THB "assumed all liabilities

incurred by the Debtor beginning January 1, 2008 which directly related to the transferred

assets," and that "[t]herefore, the Debtor's Comerica line of credit obligation increase of

$1,569,592.82 during the period from January 1, 2008 through February 29, 2008 was an

assumed liability" of THB.[39]

In his affidavit and expert report, the Trustee's expert Mr. Mueller, like the Trustee in his

summary judgment arguments, takes too broad a view of what liabilities were assumed by THB

under the THB APA, and specifically under ¶ 2.02 of that agreement.  To establish THB's

liability, it is not enough to show merely that the proceeds of the post-January 1, 2008 increases

in the Comerica line of credit "were used to fund the operations of" the Debtor.  Nor is it enough

to show merely that the increase in the Comerica line of credit occurred after January 1, 2008 and

its proceeds were used in a way that was "directly related to the transferred assets."  Rather, the

THB APA provisions discussed above unambiguously mean that THB did not assume, but rather

excluded, liability for any post-January 1, 2008 increase in the Comerica line of credit to the

extent the proceeds of that increase were used by the Debtor to pay accounts payable that arose

before January 1, 2008.  Such accounts payable, and therefore any increase in the Comerica line

of credit used to pay such accounts payable, were not "obligations [or] Liabilities arising out of

the operations of the Transferred Assets from and after the Effective Date," within the meaning

---

[38]  Aff. of Kurt P. Mueller, dated November 15, 2012 (copy attached as Ex. C to Docket # 127 in
Adv. No. 10-6123), at ¶¶ 16, 17.

[39]  *See* Expert Witness Report of Kurt P. Mueller, CPA, dated September 28, 2012 (copy attached
as Ex. D to Docket # 127, filed in Adv. No. 10-6123), at 5, 6.

of ¶ 2.02(a)(ii) of the THB APA ("Assumed Liabilities").  Rather, they were "obligations arising out of the operation of the Business prior to the Effective [D]ate," within the meaning of ¶ 2.02(b)(ii) of the THB APA ("Excluded Liability").

There is no evidence in the record from the Trustee's expert Kurt Mueller that quantifies or attempts to quantify the amount, if any, of these excluded liabilities, or the amount of the liability assumed by THB, if any, under the Court's view of what liabilities THB assumed and did not assume.[40]  THB and TENA have not demonstrated that the Trustee and its accounting expert Mr. Mueller *cannot* quantify these amounts; rather, only that they have not yet done so.

THB and TENA argue in detail how the Trustee's evidence does not establish how much, if any, of the increased line of credit was used by Debtor to pay accounts payable or other business expenses arising after January 1, 2008, as opposed to those arising before that date. And THB and TENA cite, among other things, an unsworn rebuttal report from their accounting expert, Michael N. Kahaian, dated October 15, 2012, and Mr. Kahaian's unsworn expert report, dated September 28, 2012.[41]  The Court agrees with THB and TENA that the evidence cited by the Trustee, including but not limited to the Kurt Mueller affidavit and expert report, does not establish the validity and amount of the Trustee's "due to/due from" claim.

---

[40]  For example, and as THB and TENA correctly state, Mr. Mueller's expert report shows that "[h]e did not . . . look at the checks written off the line of credit in January and February of 2008 and then match them to the invoices that they actually paid."  (THB/TENA Br., Docket # 127 filed in Adv. No. 10-6123, at 15).

[41]  These documents are in the record as Ex. 3a and Ex. 3, respectively, attached to the THB/TENA brief at Docket # 110, filed in Adv. No. 10-6123.

During the hearing on the summary judgment motions, counsel for THB/TENA went a step further, and argued that Mr. Kahaian's expert report[42] actually establishes that THB and TENA owe nothing to the estate on the Trustee's "due to/due from" claim. But THB and TENA have not adequately explained, in any of their briefs or during the hearing, how Mr. Kahaian's expert report, which is quite complex, negates the Trustee's specific "due to/due from" claim. And this is not readily apparent to the Court from reading the expert report. The Court therefore disregards this summary judgment argument by THB and TENA, as perfunctory and not adequately developed. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)(citations omitted)("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.'"); *Seoane-Vazquez v. Ohio State Univ.*, No. 13-3029, 2014 WL 4057829, at *15 (6th Cir. Aug. 18, 2014)(Batchelder, J., concurring in part and dissenting in part)(citing cases).

The Court concludes that there are genuine disputes of material fact that preclude summary judgment for either the Trustee or THB/TENA regarding Count I (the "due to/due from" claim) of the Trustee's complaint.

## B. Counts IV and V of the Trustee's cross claims against THB and TENA in Adversary No. 10-7341 (alleged fraudulent transfer of Debtor's accounts receivable under the Sakoma APA)

In Counts IV and V of the Trustee's cross-claims in Adversary No. 10-7341, the Trustee seeks the same relief against THB and TENA that he seeks against Sakoma, as discussed in Part IV of this opinion — namely, avoidance of the Debtor's transfer of its accounts receivable to

---

[42]  Ex. 3 to Docket # 110.

Sakoma under the Sakoma APA, as a fraudulent transfer. The Trustee alleges that while the Sakoma APA provided that the accounts receivable of the Debtor were transferred to Sakoma, THB collected and obtained those accounts receivable of the Debtor, and that TENA is the successor of THB.[43]

THB and TENA make several arguments in support of summary judgment on the Trustee's claims and cross-claims against them. But the Court must deny their summary judgment motion in its entirety, for the reasons discussed below.

The first two arguments by THB and TENA focus on the Trustee's claims that the Debtor's transfer of its accounts receivable under the Sakoma APA was an avoidable fraudulent transfer. This claim by the Trustee is discussed in Part IV of this opinion.

### 1. The argument that the Debtor's accounts receivable were fully encumbered by a valid lien at the time of their transfer

THB and TENA first argue that the transfer of the Debtor's accounts receivable under the Sakoma APA cannot be avoided as a fraudulent transfer claim under the Uniform Fraudulent Transfer Act ("UFTA"), because at the time of the transfer, the Debtor's accounts receivable were fully encumbered by Comerica's all-asset lien, to secure repayment of the Debtor's debt to Comerica, including the Debtor's debt under the Comerica line of credit. As THB and TENA correctly point out, Michigan's version of the UFTA excludes from the definition of "asset" property of the debtor "to the extent it is encumbered by a valid lien." Mich. Comp. Laws Ann. § 566.31(b)(i). Because of this, a debtor's transfer of a fully encumbered asset does not fall within the UFTA's definition of "transfer," which is limited to disposing of "an asset or an

---

[43] Count I of Trustee's Compl. in Adv. No. 10-6123 (Docket # 1) at ¶ 41.

interest in an asset." *See* Mich. Comp. Laws Ann. § 566.31(l). Because the fraudulent transfer provisions of the UFTA apply only to a "transfer" by a debtor, or an "obligation incurred" by a debtor, a debtor's transfer of property that is fully encumbered by a valid lien cannot be considered a "transfer" that can be avoided under any of the provisions of the UFTA. *See* Mich. Comp. Laws Ann. §§ 566.34(1), 566.35(1), 566.35(2).

There is no genuine dispute that at the time of the February 29, 2008 closing of the Sakoma APA, Comerica had a valid lien that fully encumbered all of the Debtor's accounts receivable.[44] As a result, the Debtor's transfer of its accounts receivable at that time cannot be avoided as a fraudulent transfer under the Michigan's version of the UFTA. *See generally Rafool v. Propac Sys., LLC (In re Fleming Packaging Corp.)*, No. 05-8124, 2007 WL 1021884 (Bankr. C.D. Ill. 2007).

The Trustee does not dispute these points of law about the UFTA. But of the Trustee's fraudulent transfer counts against THB and TENA, only one includes a claim for avoidance under Michigan's version of the UFTA, via 11 U.S.C. § 544(b) — namely, Count IV of the Trustee's Complaint in Case No. 10-6123. All of the other counts seek avoidance only under § 548 of the Bankruptcy Code, 11 U.S.C. § 548(a)(1). And Count IV of the Trustee's Complaint is not limited to seeking avoidance of the transfer of the Debtor's accounts receivable under the Sakoma APA. Rather, that account more broadly seeks avoidance of the transfer of all of the Debtor's assets under the Sakoma APA, the THB APA, and the Hondurus APA, by which the

---

[44] The Trustee initially argued that at the time of the transfer of the Debtor's accounts receivable, the Comerica lien had been discharged because the debt to Comerica, including the line of credit, had been paid off. The Trustee's argument is incorrect, however, because there is no genuine dispute that the Comerica line of credit was not paid off until March 2008.

Trustee alleges the Debtor "transferred substantially all of the assets of Debtor to THB."[45]  In

their summary judgment motion, THB and TENA do not discuss whether or how their legal

argument under the UFTA applies to this broader fraudulent transfer claim.  With respect to

Count IV, therefore, THB and TENA are not entitled to summary judgment on the Trustee's

fraudulent transfer claim, based on their argument that the Debtor's accounts receivable were

fully encumbered by a lien at the time of transfer.

And THB/TENA's argument under the Michigan UFTA does not constitute a defense to

the Trustee's fraudulent transfer claims based on § 548(a)(1) of the Bankruptcy Code, including

the Trustee's claim seeking avoidance of the Debtor's transfer of its accounts receivable under

the Sakoma APA.  It is not a valid defense, per se, if the Debtor's accounts receivable were fully

encumbered by the Comerica lien at the time of transfer.  Unlike the UFTA, § 548(a)(1) is not

limited to avoidance of transfers of the Debtor's unencumbered property.  First, there is no such

explicit limitation in § 548.  Second, the two cases cited by THB and TENA for the proposition

that such a limitation is implicit under § 548, are distinguishable from this case.  *See Pioneer

Liquidating Corp. v. San Diego Trust & Savings Bank* (*In re Consol. Pioneer Mortg. Entities*),

211 B.R. 704, 717-18 (S.D. Cal. 1997), *aff'd in part*, *rev'd in part*, 166 F.3d 342 (9th Cir. 1999);

*Richardson v. Huntington Nat'l Bank* (*In re Cyberco Holdings, Inc.*)*,* 382 B.R. 118, 135-43

(Bankr. W.D. Mich. 2008).

In both *Consolidated Pioneer and Richardson*, the transferee of the debtor's alleged

fraudulent transfers was the secured creditor who had a fully secured lien in the assets

transferred.  The district court and the court of appeals in *Consolidated Pioneer* each reasoned

---

[45]  Trustee's Compl. in Adv. No. 10-6123 (Docket # 1) at ¶ 92.

that in that situation there could be no avoidable fraudulent transfer under § 548 because the transfer had not depleted or diminished the Debtor's estate. These courts viewed diminution of the estate to be an implied requirement for avoidance under § 548.

The bankruptcy court's reasoning in *Richardson* was somewhat different. There, the court reasoned that the Debtor's transfer of fully encumbered assets to its secured creditor did not constitute a "transfer. . . of an interest of the Debtor in property" within the meaning of § 548(a)(1), but rather was merely a transfer of the secured creditor's own property — its collateral — to that creditor. *Richardson*, 382 B.R. at 137-141.[46]

The court does not view these two cases as establishing a per se rule precluding avoidance under § 548(a)(1) of a debtor's transfer of a fully encumbered asset, to anyone, even to a transferee other than the secured creditor that has a lien on the assets. No such rule can be derived from the wording of § 548(a)(1). And a debtor's transfer of property it owns, but which property is subject to a valid lien, is still a transfer of "an interest of the debtor's property," within the meaning of § 548(a)(1), even if the lien fully encumbers the property. *See generally United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204-05 (1983)(property of the bankruptcy estate under 11 U.S.C. § 541(a)(1), which includes, with certain exceptions, "all legal or

---

[46] The *Richardson* court noted 11 U.S.C. § 548(c), but did not rest its decision on that section. *Richardson*, 382 B.R. at 138. Section 548(c) provides:

> Except to the extent that a transfer or obligation voidable under this section is voidable under § 544, 545, or 547 of this title, **a transferee** or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or **may retain any interest transferred** or may enforce any obligation incurred, as the case may be, **to the extent that such transferee or obligee gave value to the Debtor in exchange for such transfer or obligation.**

(Emphasis added).

equitable interests of the debtor in property as of the commencement of the case," includes property of the debtor that is subject to a lien or security interest).

The Court concludes that the following is the proper way to view a debtor's alleged fraudulent transfer of property that was subject to a lien, under § 548(a)(1) and related provisions. The transfer is a "transfer of an interest of debtor in property" within the meaning of § 548(a)(1), and is subject to avoidance if the necessary elements of avoidance under §§ 548(a)(1)(A) or 548(a)(1)(B) are met. When the property transferred was encumbered by a valid lien at the time of transfer, the issue under § 548(a)(1)(B) includes whether the debtor "received less than a reasonably equivalent value in exchange for such transfer." To the extent the transfer satisfied the debtor's debt to the secured creditor/transferee, or satisfaction of the debt of the debtor to another party, the debtor is deemed to have received "value" for the transfer, under 11 U.S.C. § 548(d)(2)(A).

Thus, in a situation like that in *Consolidated Pioneer* and *Richardson*, where the debtor transferred fully encumbered property to its secured creditor, and the debtor's debt to that creditor was thereby satisfied to the extent of the value of the property/collateral transferred, the debtor has by definition received reasonably equivalent value in exchange for the transfer, and the transfer cannot be avoided under § 548(a)(1)(B). And in that situation, the debtor cannot be shown to have made the transfer "with actual intent to hinder, delay, or defraud" creditors, within the meaning of § 548(a)(1)(A), because the debtor obviously intended to pay one of its creditors, and an intent to prefer one creditor over other creditors does not constitute an intent to "hinder, delay, or defraud" creditors. *See generally Rubin Bros. Footwear, Inc. v. Chemical Bank* (*In re Rubin Bros. Footwear, Inc.*), 119 B.R. 416, 423 (S.D.N.Y. 1990)("In order to avoid a transfer

32

under section 548(a)(1), there must be actual intent to defraud creditors. Mere intent to prefer one creditor over another, although incidentally hindering or delaying creditors, will not establish a fraudulent transfer under section 548(a)(1).")(citations omitted); *Lichtenstein v. MBNA America Bank, N.A.* (*In re Computer Personalities Sys., Inc.*), 284 B.R. 415, 420 n.9 (Bankr. E.D. Pa. 2002)("In order to prove a fraudulent conveyance, it is insufficient to show only that a transfer had the effect of defrauding certain creditors or that the transfer was made in preference to other creditors [.]")(internal quotation marks and citations omitted); *Roemelmeyer v. Intercontinental Bank* (*In re Lucar Enters., Inc.*), 49 B.R. 717, 718-19 (Bankr. S.D. Fla. 1985)("agree[ing] with the holdings in the Second and Eighth Circuits that the intent which the trustee must prove under § 548(a) must be more than a simple intent to prefer a creditor[,]" and refusing to "ascribe to § 548(a)(1) a legislative intent to authorize the avoidance of a transaction made with an intent to effect a preferential transfer simply because that was the actual intent of the parties[,]" because "[t]he Code provides a complete remedy to recover impermissible preferential transfers") (citations omitted).[47]

In this case, the Debtor's transfer of its accounts receivable under the Sakoma APA is different from the type of transfer involved in *Consolidated Pioneer* and *Richardson*.  In this case, the transfer was not made to Comerica, the Debtor's secured creditor who had a valid lien on the accounts receivable.  Rather, the Trustee alleges that the transfer was made to Sakoma and to THB.

---

[47] Moreover, § 548(c), quoted above, makes it clear than even if the transfer in this situation were somehow avoidable under § 548(a)(1)(but not §§ 544, 545, or 547), the transferee/secured creditor must be deemed to have "taken for value," and merely needs to show that it took "in good faith" in order to "retain any interest transfer" to the extent of the value it gave to the debtor.

33

And as THB and TENA vigorously contend in their other arguments, the transfer was only one part of a larger and more complex series of transactions, by which most or all of the assets of the Kensa Business Entity was transferred to THB America, THB Hondurus, and Sakoma.  *See* discussion in Parts II and IV.B of this opinion.  The Court has concluded, for the reasons stated in Part IV.B of this opinion, that it must decide the merits of Trustee's fraudulent transfer claims by viewing the entire transaction, and among other things, determining whether the value of everything that the Debtor transferred in the larger transaction was reasonably equivalent to the value of all of the benefits, direct and indirect, that the Debtor received in exchange, from any source.  Such value received by the Debtor includes the payment of the Debtor's entire debt to Comerica, which was roughly $9.2 million as of the closing of the Kensa Business Entity transaction.  THB and TENA have not demonstrated, on the present record, that when the transfer of Debtor's assets is viewed in that light, the Debtor received reasonably equivalent value.

For these reasons, THB and TENA are not entitled to summary judgment on any of the Trustee's fraudulent transfer claims, on the sole ground that the Debtor's accounts receivable were fully encumbered by a valid lien at the time of transfer.

   **2.  The argument that the Trustee cannot prove the value of the Debtor's accounts receivable when they were transferred**

THB and TENA next argue that the Trustee cannot meet his burden of proving the value of the accounts receivable that Debtor transferred under the Sakoma APA.  Section 548(b)(1)(B) requires, among other things, proof that the Debtor received "less than a reasonably equivalent

value in exchange" for the transfer. The face amount of the receivables, of course, does not necessarily equate to the actual value of those receivables at the time they were transferred.

On the present record, however, the evidence is sufficient to create a genuine dispute of material fact, precluding summary judgment for THB/TENA on this issue. The Trustee has presented some evidence regarding the actual value of the accounts receivable transferred. Harold Zaima testified that "90-plus percent, almost all the debtor's receivables were already collected" during the time period of January 1 to February 29, 2008, and that "there were a few stragglers in March, that was it."[48] This is sufficient for the Trustee to avoid summary judgment on this issue.

### 3. TENA's argument that it cannot be found liable under any theory

TENA seeks summary judgment on the Trustee's claims on an additional ground — that even if THB could be found liable on any of the Trustee's claims, TENA cannot be liable under any legal theory. The Trustee argues that TENA is liable on a successor liability theory under Michigan law, as the successor to THB. The Trustee's theory is that TENA is a mere continuation of THB, which purportedly was dissolved in June 2009. TENA disputes the Trustee's successor liability theory.

Certain facts relevant to this issue are disputed, and others are not. The Trustee and TENA agree upon the following facts. As the Court summarized at the end of Part II of this opinion, after the transaction involving the sale of most or all of the assets of the Kensa Business Entity, one of the results was that CAE US owned 80% of the membership interest in THB, among other things. (Zaima Family, LLC owned the other 20%). Later, on April 17, 2009, CAE

---

[48] Tr. of Harold Zaima November 29, 2011 Dep. (Docket # 130, Ex. 22), at 47.

US merged with TENA, with TENA being the surviving entity. One result of this merger was that TENA replaced CAE US as the 80% member of THB. Then, on June 6, 2009, TENA purportedly caused THB to dissolve.

The Trustee alleges, but TENA disputes, that after THB was dissolved, TENA "took all of the assets" of THB, and TENA "has never liquidated and distributed the assets [of THB] to the creditors [of THB], as required by the Operating Agreement of" THB.[49] This is, in part, why the Trustee contends that TENA is liable for the debt owing by THB to the bankruptcy estate under a successor liability theory.

TENA alleges, but the Trustee disputes, that the assets of THB were property disposed of, and that TENA properly acquired the THB assets, through a lawful purchase of those assets as a secured creditor of THB. TENA argues that no successor liability can attach to it for any of the debts of THB.

In further support of its position, TENA alleges, but the Trustee disputes, the following facts: CAE US loaned more than $7 million to THB, and obtained a security interest in all of THB's assets.[50] TENA succeeded to CAE US's position as secured creditor of THB, as a result of the merger with CAE US. After TENA dissolved THB on June 5, 2009, according to TENA, "THB began the winding down process," and "[i]n January of 2010, in lieu of foreclosing on [THB's] remaining assets under Article 9 of the UCC, TENA, as a secured lender, agreed instead to purchase those remaining assets (as an offset against the debt owed to TENA), which were

---

[49] Trustee's Br. (Docket # 107) at pdf p. 14.

[50] THB/TENA Br. (Docket # 127) at 7.

36

appraised at a fair market value of $3,583,945. At the time of this credit-purchase, TENA was owed more than $6.6 million by THB."[51]

The Trustee does not admit these facts alleged by TENA, and correctly points out that TENA has failed, so far, to support these facts with any admissible evidence or properly authenticated documents in the record. For that reason, the Court cannot accept these facts as established, for purposes of ruling on the summary judgment motions.

The Trustee argues that TENA is liable to the bankruptcy estate for the debts of THB, on a successor liability theory under Michigan law, because it is a "mere continuation" of THB. TENA argues that under Michigan law, there is no such successor liability in a commercial context, in cases that do not involve a products liability claim brought by an injured victim of a defective product, citing *Starks v. Michigan Welding Specialists, Inc.*, 722 N.W.2d 888, 889 (Mich. 2006). The Trustee disputes TENA's view of Michigan law.

Having reviewed the cases cited by the parties and other cases, the Court concludes that the traditional exceptions under Michigan law for the general rule of corporate successor non-liability, one of which is the "mere continuation" exception, do apply in the commercial context, and are not limited to product liability cases. The Michigan Supreme Court's one paragraph opinion in the *Starks* case, cited by TENA, does not hold otherwise.[52] Rather, the Court

---

[51] *Id.* at 8 (record citations omitted).

[52] The majority opinion in *Starks* states as follows:

> Where, as here, a successor corporation acquires the assets of a predecessor corporation and does not explicitly assume the liabilities of the predecessor, the traditional rule of corporate successor non-liability applies. *See, Foster v. Cone Blanchard Machine Co.*, 460 Mich. 696, 702, 597 N.W.2d 506 (1999). Because an exception designed to protect injured victims of defective products rests upon policy reasons not

37

concludes, based on the cases discussed below, that *Starks* limited, to product liability cases, a different exception to the traditional rule of non-liability of corporate successors, namely, the "continuity of the enterprise" doctrine, which is a separate basis for imposing successor liability from the "mere continuation" doctrine.

In *Stramaglia v. United States*, 377 Fed. Appx. 472, 474-75 (6th Cir. 2010), the United States Court of Appeals for the Sixth Circuit described and applied Michigan's traditional rule of non-liability for corporate successors, and its five exceptions, including the "mere continuation" exception:

> Michigan follows the "traditional rule of nonliability for corporate successors who acquire a predecessor through the purchase of assets." *Foster v. Cone Blanchard Mach. Co.*, 460 Mich. 696, 597 N.W.2d 506, 509 (1999). However, Michigan recognizes five narrow exceptions to the traditional rule of non-liability:
>
> (1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) **where the transferee corporation was a mere continuation or reincarnation of the old corporation.**

---

applicable to a judgment creditor, the Court declines to expand the exception to the traditional rule set forth in *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976), to cases in which the plaintiff is a judgment creditor.

*Starks*, 77 N.W.2d at 889. The single-justice dissenting opinion *in Starks* states:

> The issue of whether the continuity of the enterprise doctrine recognized in *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976), extends beyond products liability actions warrants further discussion and closer attention from this Court.

*Id.* (Kelly, J. dissenting).

38

> *Id*. at 509-10 (quoting *Turner v. Bituminous Casualty Co.*, 397 Mich. 406,
> 244 N.W.2d 873, 878 n. 3 (1976)).

(Emphasis added).

Later, in a case decided in 2013, the Sixth Circuit reiterated Michigan's traditional rule of non-liability and its five exceptions, including the "mere continuation" exception. In *C.T. Charlton & Assocs. Inc. v. Thule, Inc.*, 541 Fed. Appx. 549 (6th Cir. 2013). The court held that the "mere continuation" doctrine of successor liability still applies under Michigan law, and is not limited to products liability cases, even after *Starks*. In *Charlton*, the Sixth Circuit held that there is a further exception to the rule against successor liability under Michigan law, in addition to the traditional five exceptions, which the court referred to as the "continuity of the enterprise" doctrine. It is that doctrine that applies only in product liability cases under Michigan law. As the Sixth Circuit explained at length, this is a different exception to the rule against successor liability from the "mere continuation" exception, and it is only that "continuity of the enterprise" exception that is limited to product liability cases by *Starks*. The "mere continuation" exception retains its general applicability under Michigan law, and does apply in the commercial context. It is not limited to product liability cases by *Starks*. As the Sixth Circuit explained, at length:

> Michigan follows the traditional rule of successor liability, under which the successor in a merger ordinarily assumes all of its predecessor's liabilities, but a purchaser of assets for cash does not. *Foster v. Cone Blanchard Mach. Co.*, 460 Mich. 696, 597 N.W.2d 506, 509 (1999). With respect to asset purchases, this general rule is subject to five narrow exceptions: 1) express or implied assumption of liability; 2) de facto consolidation or merger; 3) fraud; 4) transfer lacking good faith or consideration; and 5) "mere continuation or reincarnation of the old corporation." *Id*. at 509 10. **In *Turner v. Bituminous Cas. Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976), the Michigan Supreme Court expanded the scope of successor liability in the products-liability context,**

39

establishing the **"continuity of the enterprise" doctrine.** *Turner*, 244 N.W.2d at 883. Under this doctrine, successor liability is imposed if 1) there is continuity of management, personnel, location, assets, and operations; 2) the predecessor promptly ceases business operations; and 3) the purchaser assumes those liabilities necessary for continuity in business operations. *See Foster*, 597 N.W.2d at 510 (describing *Turner* doctrine). *Turner* also deemed relevant whether the purchasing corporation holds itself out to the world as the "effective continuation" of the predecessor. *Ibid*. CTC argues that this broader standard applies across the board; Thule argues that it is limited to the products-liability context.

**Before answering the question of whether the "continuity of the enterprise" doctrine applies in the context of a commercial contract, an analytical ambiguity should be cleared up. Both parties, and the district court, suggest that the "mere continuation" exception and the "continuity of the enterprise" doctrine are one and the same.** There is some Michigan case law in support of this position. *RDM Holdings, LTD v. Continental Plastics Co.*, 281 Mich.App. 678, 762 N.W.2d 529, 552 (2008) ("As indicated earlier in this opinion, the continuing enterprise theory (mere continuation or reincarnation of the old corporation) is the only theory that can be pursued by plaintiffs at trial.") **A review of *Turner*, however, suggests that these are best understood as two independent exceptions, motivated by different policy concerns and applied in different circumstances**. In creating the "continuity of the enterprise" doctrine, *Turner* modified one of the traditional "limited exceptions" to successor liability to fit in the products-liability context. **But this modified exception was not the "mere continuation" exception, which is only mentioned in passing in *Turner*, appearing in a list in a footnote.** ***Turner*, 244 N.W.2d at 877 n. 3. Instead, *Turner* modified the de-facto-merger doctrine**, a traditional exception that imposes successor liability when four requirements are met: 1) continuation of the enterprise, 2) continuity of shareholders, 3) ending of ordinary business operations by the seller, and 4) assumption of liabilities and obligations necessary for uninterrupted continuation of business operations by the purchaser. *Turner*, 244 N.W.2d at 879. After reviewing the policies underlying products-liability law, the court concluded that, in the products-liability context, the form of the acquisition is irrelevant to the question of liability. *Id*. at 880 ("[L]ogically and teleologically, there is no basis for treating a purchase of corporate assets different from a de facto merger."). As a result, the *Turner* court dropped the "continuity of shareholders" element, requiring only elements 1, 3, and 4 of the de-facto-merger doctrine to establish successor products liability. *Id*. at 883. **The "continuity of the enterprise" doctrine, therefore, is best**

**read as a relaxation of the de-facto-merger doctrine in products-liability cases, not a redefinition of the "mere continuation" exception. The "mere continuation" exception remains narrow, but retains its general applicability.**

No matter how the "continuity of the enterprise" doctrine is characterized, a review of Michigan law and the policies underlying the doctrine makes clear that it is only meant to apply in products-liability cases (and potentially a few other areas animated by similar public-policy concerns). In creating the doctrine, *Turner* emphasized that "[t]his is a products liability case first and foremost." *Turner*, 244 N.W.2d at 877. This was no hollow distinction, but the primary grounds for departing from traditional corporate-law doctrines. Because the traditional doctrines of successor liability "developed to protect the rights of creditors and minority shareholders," the Michigan Supreme Court reasoned that such doctrines are "not applicable to meeting the substantially different problems associated with products liability torts." *Id*. at 878; *see also Foster*, 597 N.W.2d at 510 ("The traditional rule reflects the general policy of the corporate contractual world that liabilities adhere to and follow the corporate entity.... In the context of tort law, the traditional rule with its narrow exceptions has been criticized as an elevation of form over substance...."). Thus, while *Turner* may have "shake[n] off various impediments associated with traditional concepts" for products-liability cases, those impediments remain in force elsewhere. *Turner*, 244 N.W.2d at 877; *see also id*. at 880 ("This is precisely the result when the problem is correctly treated as a products liability case and is decided on products liability principles rather than simply by reexamining and adjusting corporate law principles.").

**Subsequent case law has affirmed this limitation.** In tracing the development of the doctrine, *Foster* explained that tort-policy concerns "shaped this Court's expansion of the traditional rule." 597 N.W.2d at 510. In *Craig ex rel. Craig v. Oakwood Hosp.*, 471 Mich. 67, 684 N.W.2d 296 (2004), the Michigan Supreme Court declined to extend successor liability in the medical-malpractice context, reasoning "[n]ot only are the *Turner/Foster* requirements not met here but, more important, the policies that justify the imposition of successor liability are noticeably inapplicable here." *Id*. at 315. **Likewise, *Starks v. Mich. Welding Specialists, Inc.*, 477 Mich. 922, 722 N.W.2d 888, 889 (2006), reaffirmed the traditional rule of successor non-liability for asset purchases, rejecting expansion of the *Turner* doctrine "[b]ecause an exception designed to protect injured victims of defective products rests upon policy reasons not applicable to a judgment creditor."** *Id*. at 889. Our circuit as well has

rejected application of *Turner* in other contexts; in an environmental-liability case, we broadly concluded that "the Michigan Supreme Court intended that the continuing enterprise exception be limited to products liability cases." *City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 252 53 (6th Cir.1994).

. . .

Most [of the cases cited by CTC] stand for **the uncontroversial proposition that the traditional exceptions to successor liability (specifically "mere continuity") apply in the commercial context. Under the "mere continuity" exception, courts will look to the totality of the circumstances but only if the "indispensable" requirements of common ownership and a transfer of substantially all assets are met first.** *See Stramaglia v. United States*, 377 Fed. Appx. 472, 475 (6th Cir. 2010). **In practice, the "mere continuity" exception is a cousin of piercing the corporate veil, and thus targeted at limiting abuse of the corporate form, unlike the "continuity of the enterprise" doctrine, which instead imposes liability for policy reasons.** *See, e.g., RDM Holdings*, 762 N.W.2d at 552 ("Much of the evidence discussed above in relation to the corporate veil claim is equally relevant to the successor liability claim.") Thus, in nearly every case cited by CTC, there was common ownership between the predecessor and successor corporation. *Stramaglia*, 377 Fed. Appx. at 473 ("By 1997, *Stramaglia* was the sole shareholder, director, and president of both Auburn Park and Volpe Vito."); *Steinberg v. Young*, No. 09 11836, 2010 WL 1286606, at (E.D. Mich. Mar. 31, 2010) ("Mr. Steinberg alleges that Mr. Young has abused the corporate form of the SDE Entities, and that Mr. Young has been fraudulently transferring assets out of the SDE Entities in an effort to defeat Mr. Steinberg's collection efforts."); *RDM Holdings*, 762 N.W.2d at 551 (Mich.Ct.App.2008) ("Here, there was documentary evidence that Con Plastics, a 49 percent owner of Con Lighting, and its president, Anthony Catenacci, fully controlled every aspect of the operations at Con Lighting, including the decision to cease operations and file for bankruptcy to the detriment of numerous creditors."); *Lakeview Commons LP v. Empower Yourself, LLC*, 290 Mich. App. 503, 802 N.W.2d 712, 716 (2010) ( "Phyllis owned 80 percent and Troy owned 20 percent of both Empower and Hamsa.")

*Charlton*, 541 Fed. Appx. at 551-55 (emphasis added)(footnote omitted)(citations omitted).

42

Under Michigan law, as interpreted by the Sixth Circuit, therefore, the Trustee's theory that TENA can be liable for the debts of THB, on the theory that TENA is a "mere continuation" of THB, is a valid legal theory. There is no dispute that substantially all of the assets of THB were transferred to TENA, and that at the time of that transfer TENA was the 80% owner of THB. These threshold requirements for application of the "mere continuation" doctrine under Michigan law, therefore, appear to be met.[53] Beyond these threshold requirements, the Court must consider "the totality of the circumstances and engage in a multi-factor analysis." *See Stramaglia,* 377 Fed. Appx. at 475. As described by the Sixth Circuit in *Stramaglia*:

> The Michigan Supreme Court has recognized the "mere continuation" exception since the turn of the twentieth century. *See Chase v. Mich. Tel. Co.*, 121 Mich. 631, 80 N.W. 717, 718 (1899) (citing *Austin v. Tecumseh Natl. Bank*, 49 Neb. 412, 68 N.W. 628 (1896)). The court has indicated that the exception rests on two related principles. *See Pearce v. Schneider*, 242 Mich. 28, 217 N.W. 761 (1928) (imposing liability on a corporation because it was a "reincarnation" of its predecessor). First, "courts will not tolerate any species of transaction where the stockholders in the debtor corporation are permitted, by virtue of their stock ownership, to retain for themselves an interest in the corporate assets until the debts of the corporation shall have been paid." *Id.* at 762 (quoting 15 A.L.R. 1112). Second, a "corporation which acquires the entire property of another corporation under an arrangement which has the effect of distributing the assets of the latter corporation among its stockholders, to the exclusion of its creditors, takes the property subject to payment of the debts of its vendor." *Ibid.* (quoting *Grenell v. Detroit Gas Co.*, 112 Mich. 70, 70 N.W. 413, 413 14 (1897)).
>
> **To determine whether a successor corporation is a mere continuation of its predecessor, Michigan courts examine the totality of the circumstances and engage in a multi-factor analysis.** *See, e.g.*, *id.* at

---

[53] Michigan case law does not require a 100% identity in ownership in order to meet the common ownership requirement. *See e.g.*, *First Presbyterian Church of Ypsilanti v. H.A. Howell Pipe Organs, Inc.*, No. 07-13132, 2010 WL 419972 (E.D. Mich. Feb. 1, 2010), at *7 ("'absolutely identical ownership between the corporations. . . need not be present.'")(citations omitted); and cases cited in *Charlton*, 541 Fed. Appx. at 555 (last paragraph quoted above).

762; *Shue & Voeks, Inc. v. Amenity Design & Mfg., Inc.*, 203 Mich.App. 124, 511 N.W.2d 700, 702 (1993); *Ferguson v. Glaze*, No. 268586, 2008 WL 314544, at *5 (Mich.App. Feb. 5, 2008). The only indispensable prerequisites to application of the exception appear to be common ownership and a transfer of substantially all assets.FN2 *See, e.g.*, *Pearce*, 217 N.W. at 762; *Shue & Voeks, Inc.*, 511 N.W.2d at 702; *Gougeon Bros. v. Phoenix Resins, Inc.*, No. 211738, 2000 WL 33534582, at *2 (Mich.App. Feb. 8, 2000). Beside these two factors, the most important consideration appears to be the nature of the business performed by the successor corporation — that is, whether its "main corporate purpose was to conduct the same business" as its predecessor. *Pearce*, 217 N.W. at 762; *see also Shue & Voeks, Inc.*, 511 N.W.2d at 702; *Ferguson*, 2008 WL 314544, at *2. Several other factors also bear upon "mere continuation" analysis: the new corporation's retention of the old corporation's officers and employees, *see Shue & Voeks, Inc.*, 511 N.W.2d at 702; *Ferguson*, 2008 WL 314544, at *5; the new corporation's occupancy of the old corporation's place of business; *see Gougeon Bros.*, 2000 WL 33534582, at *2; and the new corporation's selective repayment of the old corporation's debts, *see ibid*.

FN2. Notably, however, no Michigan court has found these factors alone sufficient to justify imposition of successor liability.

Volpe-Vito asserts that a court must also find evidence of inadequate consideration or fraud to impose liability under the "mere continuation" exception. We recognize that several jurisdictions do require the presence of one or both of these factors. *See, e.g.*, *Katzir's Floor & Home Design, Inc. v. M MLS.com*, 394 F.3d 1143, 1150 (9th Cir.2004) (discussing California law). Michigan, however, is not such a jurisdiction. *See Shue & Voeks, Inc.*, 511 N.W.2d at 702 (finding the Uniform Fraudulent Conveyance Act inapplicable based on the adequacy of consideration and absence of fraud, but failing to mention either the absence of fraud or adequacy of consideration as part of "mere continuation" analysis).

*Stramaglia*, 377 Fed. Appx. at 475-76.

On the present record, the Court must conclude that TENA has not demonstrated that the

Trustee cannot prevail on his "mere continuation" successor liability theory under Michigan law.

Genuine issues of material fact remain.

44

### C. Counts IV and V in the Trustee's complaint in Case No. 10-6123 (alleged fraudulent transfer of substantially all of the Debtor's assets under the Sakoma APA, the THB APA, and the Honduras APA)

In their briefs, THB and TENA appear to seek summary judgment on Counts IV and V of the Trustee's complaint in Adversary No. 10-6123, on the ground that the total consideration provided by the purchasers in exchange for the total value of the Kensa Business Entity was at least reasonably equivalent to that total value.[54]  This argument, however, is too broad to establish that THB and TENA are entitled to summary judgment on the Trustee's claims.  The sale of the Kensa Business Entity, described in detail in Part II of this opinion, involved the sale not only of the Debtor's assets, but also the sale of assets of other related entities that are not debtors in this bankruptcy case, including Kensa Mexico, and Kensa Hondurus, and Deckerville.  Thus, in determining whether *the Debtor* received reasonably equivalent value in exchange for the assets of *the Debtor* that were transferred, the focus must be on the value of the direct and indirect economic benefits that *the Debtor* received in the transaction, compared to the value of *the Debtor's* assets that were transferred in the transaction.  *See* discussion in Part IV.B. of this opinion.  The argument by THB/TENA, therefore, is not focused narrowly enough, unless the Court is to ignore the corporate separateness of the Debtor and the other entities who were the sellers in the larger transaction involving the sale of the Kensa Business Entity.  Neither the Trustee nor any of the parties have established that the Court can ignore that corporate separateness.

For these reasons, and on the present record, THB and TENA have not demonstrated that they are entitled to summary judgment based upon this last argument.

---

[54]  *See* THB/TENA Br. (Docket # 110) at 3-4, 15-16.

## VI.  Conclusion

For the reasons stated in this opinion, the Court will enter an order denying each of the summary judgment motions.

**Signed on October 17, 2014**                    /s/ Thomas J. Tucker_____
                                              **Thomas J. Tucker**
                                              **United States Bankruptcy Judge**